FILED
2021 Mar-31  PM 06:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL L. WEATHERS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  3:16-cv-00284-MHH** |
| | } | |
| **VOLUNTEERS OF AMERICA,** | } | |
| **NORTH ALABAMA, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION AND ORDER

This case concerns a hijacked settlement in one of several race discrimination actions that plaintiff Michael Weathers filed against Volunteers of America on behalf of VOA employees.  In the underlying action, Mr. Weathers, an attorney experienced in employment discrimination litigation, represented Cassandra Renee Nichols, a former employee of Volunteers of America, North Alabama.  After years of litigation in the *Nichols* case, including a trip to the Eleventh Circuit Court of Appeals, Mr. Weathers, at Ms. Nichols's direction, made a $70,000 settlement demand to VOA.  VOA then sent one of its employees to Ms. Nichols's home to urge her to settle her claim directly with the company for $10,000.  According to Ms. Nichols, the VOA employee who approached her assured her that she would not

have to pay Mr. Weathers if she settled directly with VOA. Ms. Nichols agreed, and the Court dismissed her lawsuit against VOA.

Afterwards, Mr. Weathers filed this suit against Ms. Nichols; Volunteers of American, North Alabama – VOANA; Volunteers of America, Southeast, Inc. – VOASE; and several individual officers of both organizations. (Doc. 1, pp. 3–4, ¶¶ 5–12).[1] Mr. Weathers asserts a § 1981 retaliation claim and several state law tort claims against the VOA defendants. (Doc. 1, pp. 15–30, ¶¶ 52–134). He asserts a breach of contract claim against Ms. Nichols. The VOA defendants have asked the Court to enter judgment in their favor on Mr. Weathers's claims against them. (Doc. 66).

To resolve the VOA defendants' motion for summary judgment, we begin with a brief statement of the summary judgment standard and then summarize the summary judgment evidence, presenting it in the light most favorable to Mr. Weathers. Next, we turn to the law that applies to Mr. Weathers's claims and evaluate the summary judgment evidence, disputed and undisputed, within the framework of the statutes and precedential decisions that govern his claims, starting with his federal claim and then turning to his state law claims. We end with our conclusion regarding the defendants' motion.

---

[1] Unless there is reason to distinguish between VOANA and VOASE, the Court refers generally to VOA in this opinion.

2

**SUMMARY JUDGMENT STANDARD**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, the Court views the evidence in the light most favorable to Mr. Weathers, the non-movant.

**SUMMARY JUDGMENT EVIDENCE**

For years, VOA has operated homes in Alabama for individuals with special needs. (Doc. 67-43, pp. 8–9, tpp. 32–33). Defendants Wallace Davis, Deanna Ferguson, Terry Bartlett, Kimberly O'Neal, and Cassandra Nichols worked for

VOA.  (Doc. 67-31, p. 3; Doc. 67-42, p. 3, tp. 12; Doc. 67-43, p. 3, tp. 12; Doc. 67-45, p. 3, tp. 11: Doc. 67-44, p. 3, tp. 12).  Likewise, for years, Michael Weathers has practiced law in Alabama, representing plaintiffs in employment litigation.  (Doc. 67-40, pp. 35, 78, tpp. 137, 311–12).

In April of 2007, Ms. Nichols hired Mr. Weathers to file a lawsuit against VOA for race discrimination.  (Doc. 67-1, pp. 1–6).  Ultimately, Mr. Weathers represented Ms. Nichols and eight other plaintiffs in race discrimination lawsuits against VOA.  (Doc. 74-41).[2]  In a written contingency fee agreement, Ms. Nichols agreed to pay Mr. Weathers 50% of all amounts recovered in a judgment in her favor or in a settlement with VOA, plus out-of-pocket expenses.  (Doc. 67-1, p. 1).  The agreement states that attorney's fees awarded by a court are not part of the contingency fee.  (Doc. 67-1, p. 1).  If Ms. Nichols chose to discharge Mr. Weathers, she agreed to do so in writing and to pay to Mr. Weathers the greater of "the reasonable value of the services rendered to that date according to the hourly rates that Attorney charges at that time or [] the contingency percentage applicable at the time of discharge as applied to any recovery Client may ultimately obtain, plus legal

---

[2] Mr. Weathers filed a total of ten lawsuits on behalf of plaintiffs against VOA.  (Doc. 74-41).  Many of these cases involved claims for racial discrimination in violation of Title VII and Section 1981.  *See generally Chandler v. VOA*, 3:12-cv-3701-AKK, Doc. 28 (N.D. Ala. 2012); *Doxie v. VOA*, 3:12-cv-3702-AKK, Doc. 26 (N.D. Ala. 2012); *King v. VOA*, 3:08-cv-856-AKK, Doc. 74 (N.D. Ala. 2008).  In their complaints, the plaintiffs alleged that VOA treated Black employees differently from white employees, and Black employees endured racial harassment while they worked for VOA.

interest . . . ." (Doc. 67-1, pp. 2–3). The agreement also states: "Attorney will advise Client of any settlement offered by the respondent during the pendency of the case. Client will decide whether to accept any settlement offered." (Doc. 67-1, p. 2).

On March 21, 2008, Mr. Weathers filed suit on Ms. Nichols's behalf in federal court. (Doc. 67-31, p. 11). In her complaint, Ms. Nichols alleged that VOA had violated her rights under "Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991," and she asserted that she instituted her action "pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(t)(l) and (3) ('Title VII') and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a." (Doc. 67-7, pp. 1–2). With respect to her race discrimination claims, Ms. Nichols alleged that her supervisors and fellow employees at VOA subjected her to "daily racial taunts, refusals to acknowledge Nichols, refusing to address the racially hostile environment to which Nichols was subjected, unfairly disciplining her, and giving her unfair employment options." (Doc, 67-7, p. 4, ¶ 11).[3] Following discovery, the presiding judge granted summary judgment for VOA on Ms. Nichols's claims. (Doc. 67-31). Ms. Nichols appealed.

_____

[3] Ms. Nichols also asserted several state law claims relating to race discrimination and a federal claim under the Americans with Disabilities Act. (Doc. 67-7, pp. 6–16).

The Eleventh Circuit affirmed summary judgment on most of Ms. Nichols's claims but reversed and remanded Ms. Nichols's Title VII hostile work environment claim.  (Doc. 67-32, p. 22).  A copy of the Eleventh Circuit's opinion in *Nichols* is attached to this opinion.[4]  The Eleventh Circuit described Ms. Nichols's claims against VOA as follows:  "she alleged racial discrimination in employment, 42 U.S.C. §§ 1981, 2000e-2(a)(1); retaliation, 42 U.S.C. § 2000e-3(a); and a hostile work environment, 42 U.S.C. § 2000e-2(a)(1)."  (Case 08-501, Doc. 66, p. 2).[5]  The

_____

[4] The opinion also may be found at *Nichols v. Volunteers of Am., N. Ala., Inc.*, 470 Fed. Appx. 757 (11th Cir. 2012).

[5] In the summary judgment opinion that the Eleventh Circuit reviewed, this Court described Ms. Nichols's claims as follows:  "Plaintiff, Cassandra Nichols, asserts claims against her employer, Volunteers of America, North Alabama, Inc., under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ('Title VII'), for racial discrimination and disparate treatment, a racially hostile work environment, and retaliation."  (Case 08-501, Doc. 57, p. 1).  In its analysis, the Court stated:  "Title VII and 42 U.S.C. § 1981 make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race. *See* 42 U.S.C. §§ 1981, 2000e-2(a)."  (Case 08-501, Doc. 57, p. 15).

In the pretrial order for Ms. Nichols's case, the defendants denied that § 1981 applied to Ms. Nichols's claims.  (Doc. 67-4, p. 16; Case 08-501, Doc. 101, p. 4).  Ms. Nichols strongly asserted that she brought her race discrimination claims under § 1981, stating:

> Plaintiff's claims are brought under 42 U.S.C. § 1981; the trial court held that Plaintiff's claims are brought under 42 U.S.C. § 1981; Volunteers of America, North Alabama, Inc. did not appeal the trial court's order; and, the United States Court of Appeals for the Eleventh Circuit stated that Plaintiff's claims are brought under 42 U.S.C. § 1981. The time to file a motion to dismiss is long, long past. It is settled that Plaintiff's claims are brought under 42 U.S.C. § 1981.

(Case 08-501, Doc. 101, p. 3).  Neither party was entirely correct; Ms. Nichols brought her race discrimination claims pursuant to § 1981 and Title VII, but only her Title VII hostile work environment claim survived her appeal of the district court order granting VOA's motion for summary judgment on all of her claims.

Court of Appeals described the evidence relevant to Ms. Nichols's race discrimination claims. The evidence included an affidavit from Ms. Nichols's direct supervisor, Sonja King, in which Ms. King explained that her supervisor, Teresa Stephenson, a white woman, had planned to fire Ms. Nichols "because she is black, has a loud mouth, and she wanted a white person, Melissa Castle, in that position." (Case No. 3:08-501-AKK, Doc. 66, p. 11).

Ms. Nichols's case returned to this Court in January of 2013. (Case 08-501, Doc. 67). Following remand, the district court ultimately set Ms. Nichols's case for trial on March 3, 2014. (Doc. 67-3, p. 13). Ms. Nichols sought compensatory damages for mental anguish and under $3,500 in lost wages. (Doc. 67-10).[6] Additionally, by statute, Ms. Nichols was eligible for an award of attorney fees. VOA's insurer had refused to provide coverage for Ms. Nichols's claim because VOA waited too long to give its insurer notice of Ms. Nichols's lawsuit against the company, so VOA was footing the bill for Ms. Nichols's lawsuit itself, just as it had

---

While the appeal was pending, VOANA stopped operating and transferred its operations to VOASE. (Doc. 67-42, p. 25, tpp. 97–98). The details of this transition were the subject of a consolidated motion for sanctions in Ms. Nichols's case and in the cases that several of her co-employees brought against VOA. (Case 08-501, Doc. 85). Ms. Nichols sought, unsuccessfully, to add VOASE as a defendant in her action. (Case 08-501, Doc. 90).

[6] In her complaint, Ms. Nichols included a request for punitive damages for race discrimination, (Doc. 67-7, p. 6), but in her statement of damages, she did not mention punitive damages, (Doc. 67-10).

handled Ms. Chandler's and Ms. King's lawsuits without the benefit of insurance coverage. (Doc. 67-42, pp. 47–48, tpp. 188–190).[7]

On February 3, 2014, at Ms. Nichols's direction, Mr. Weathers sent a demand letter to Chris Kuffner and David Block, the attorneys for VOA, offering to settle Ms. Nichols's case for $70,000. (Doc. 67-9; Doc. 74-46, pp. 12–13). Mr. Kuffner and Mr. Block forwarded the letter to Wallace Davis, President and CEO of VOA, and to Deanna Ferguson, the Vice President of VOA. (Doc. 74-82, p. 4). The same day, Ms. Ferguson sent a message to Dr. Davis in which she remarked: "His clients are getting nervous it would seem …….the trial is scheduled for March 3rd. This is another one in which we have no insurance coverage." (Doc. 74-82, p. 9).

Ms. Ferguson recommended to Dr. Davis that VOA should try to settle Ms. Nichols's claim without Mr. Weathers's involvement, and Dr. Davis agreed. (Doc. 74-83, pp. 28–29, tpp. 112–14). In a message to Dr. Davis dated February 10, Mr. Kuffner stated:

> I am writing to follow up on our conversation earlier this afternoon. First, you are not authorizing us to respond to the $70,000 settlement offer Mike Weathers sent to us in the Nichols case on February 3, 2014. Instead, the company may explore settlement directly with Ms. Nichols. As we discussed, because Ms. Nichols is represented by a lawyer, David [Block] and I cannot directly or indirectly have communications

---

[7] VOA stated in its summary judgment brief that it did not have insurance coverage for the *Chandler* and *King* cases. (Doc. 66-1, p. 8). The record cite that VOA offered for the proposition concerns VOA's lack of insurance for Ms. Nichols's case. Dr. Davis testified that VOA did not have insurance for two cases, referring to Ms. Nichols's case and one other case. (Doc. 67-42, p. 48, tp. 190). Nevertheless, the Court accepts VOA's representation that it did not have insurance coverage for the *Chandler*, *King*, and *Nichols* cases.

with her.  However, nothing prevents VOANA (as the party in this case)
from negotiating directly with her about settlement or any other issue.

(Doc. 74-82, p. 14).  Ms. Ferguson testified that she proposed a direct settlement
with Ms. Nichols because defending the race discrimination actions that Mr.
Weathers had filed was expensive, and the lawsuits were a "nuisance" and
"distracting" from VOA's work "serving people with developmental disabilities."
(Doc. 74-83, p. 32, tpp. 127–28).  Dr. Davis instructed Ms. Ferguson to put the two
years she had spent in law school to work to try to settle the case, and he gave her
permission to enlist the help of Kimberly O'Neal, a Black VOA employee.  (Doc.
67-2, p. 41, tp. 163; Doc. 67-43, p. 32, tp. 127).

On February 19, 2014, Ms. O'Neal went to Ms. Nichols's house "to see if
there was a way that she . . . would settle out of court for this case."  (Doc. 67-44, p.
30, tp. 117; Doc. 74-46, pp. 2–4).  Ms. O'Neal and Ms. Nichols discussed an amount
for settlement and, after demands from Ms. Nichols for $70,000 and $50,000,
eventually agreed to a sum of $10,000 because Ms. O'Neal told Ms. Nichols that
VOA could not afford more.  (Doc. 67-41, p. 59, tp. 235; Doc. 67-12, pp. 13–14;
Doc. 67-44, pp. 35–36, tpp. 140–44).  During their discussion, Ms. Nichols showed
Ms. O'Neal her contract with Mr. Weathers, and Ms. O'Neal read the contract.
(Doc. 67-41, p. 50, tp. 197).  According to Ms. Nichols, Ms. O'Neal said that Mr.
Weathers had "not done what he was supposed to do," that Mr. Weathers had "no
intention on helping us on our case," that she did not want Ms. Nichols to have to

pay VOA if she lost, and that Ms. Nichols "would be wasting time on [her] case." (Doc. 67-5, pp. 1–2 (Nichols Feb. 21, 2014 statement); Doc. 74-46, pp. 7–11; *see also* Doc. 67-18, p. 2). Ms. Nichols explained that Ms. O'Neal told her that she would not have to pay Mr. Weathers. (Doc. 67-18, pp. 1–2).

Ms. Ferguson set to work drafting a release. (Doc. 67-43, p. 41, tp. 163). She sent the draft release to Dr. Davis and Terry Bartlett, the Chief Operating Officer of VOA. Dr. Davis emailed the draft release to Mr. Block and Mr. Kuffner for their review. (Doc. 74-82, p. 2). Mr. Block responded, noting that he had clearance from the Alabama State Bar to review the release. (Doc 74-82, p. 2).[8] Counsel for VOA proposed revisions to the draft agreement. (Doc. 74-87). Among them was the addition of the following provision: "I, Cassandra Renee Nichols, agree to petition to dismiss the Lawsuit in its entirety, *with prejudice*, costs and fees taxed as paid. I also agree to sign or execute, for no additional consideration, any documentation needed to effectuate this dismissal." (Doc. 74-87, p. 2) (emphasis in Doc. 74-87). The following provision also was added at the suggestion of VOA's attorneys: "I acknowledge and agree that neither Volunteers of America North America nor any of the other Releasees provided me any legal or tax guidance or advice concerning any aspect of this settlement, including any obligations between me and Michael

---

[8] The Court does not know what information VOA's attorneys provided to the Alabama State Bar when they received permission to review the release because counsel made the request verbally. (Doc. 91, pp. 64–66).

Weathers." (Doc. 74-87, p. 2). Finally, VOA's attorneys added this language to the draft release: "I further acknowledge and agree that this release reflects independent negotiations directly between me and Volunteers of America North Alabama and that no attorney for either party (or any of the Releasees) was involved in these negotiations." (Doc. 74-87, p. 3).[9]

On February 20, Ms. Nichols met with Ms. O'Neal at a Wells Fargo bank to receive a cashier's check for $10,000 and to sign the release. (Doc. 67-44, p. 47, tp. 187; *see also* Doc. 67-12, p. 24). According to Ms. Nichols, Ms. O'Neal said "Mike [Weathers] is out to get VOA." (Doc. 67-5, p. 3). Ms. O'Neal told Ms. Nichols that she should cash the check immediately, which she did. (Doc. 67-18, p. 1).

Mr. Weathers learned of his client's settlement when Mr. Kuffner sent him an email message on February 21, explaining that Ms. Nichols and VOA had settled. (Doc. 67-38). Presiding Judge Abdul Kallon held an evidentiary hearing on February 26, 2014 after which he concluded that the settlement was valid and that Ms. Nichols entered the settlement voluntarily. (Doc. 67-12, p. 20). During the hearing, Mr. Weathers asked the Court to retain jurisdiction over his request for attorney's fees. Mr. Weathers argued that the Court should regard Ms. Nichols as the prevailing party so that she could petition the Court for statutory fees. (Doc. 67-12, pp. 20–21). Counsel for VOA replied: "Your Honor, if I may, the [settlement]

---

[9] The red text is from a demonstrative redline version of the draft settlement agreement.

11

agreement also says fees will be taxed as paid already. So the agreement is clear that the parties pay their own fees." (Doc. 67-12, p. 21). Judge Kallon indicated that he would take up the fee issue later; his immediate concern was cancelling the jury for the trial that was scheduled to start a few days after the evidentiary hearing. (Doc. 67-12, pp. 28, 30). He gave Mr. Weathers until February 28, 2014 to present a request for fees. (Doc. 67-12, p. 35).

On February 27, 2014, counsel for VOA filed a "Motion for Immediate Dismissal." (Case 08-501, Doc. 150). In the motion, VOA indicated that its attorneys had received a letter from Mr. Weathers that indicated to them that Mr. Weathers planned to challenge the voluntariness of Ms. Nichols's settlement. VOA argued:

> Because Mr. Weathers now takes the position that this lawsuit has not been settled, he no longer needs additional to time to brief the attorney's fees issues (rather, he apparently is going to use the additional time the Court granted him to assert yet another (frivolous) argument that the release is not valid).

> It is time for this lawsuit to be dismissed so that the parties can enjoy the peace they negotiated and upon which they agreed. Any further litigation concerning this release is redundant, wasteful and frivolous.

(Case 8-501, Doc. 150, p. 3).

On Friday, February 28, 2014, Mr. Weathers submitted to the Court a handwritten statement by Ms. Nichols in which she disavowed her testimony in the evidentiary hearing. (Doc. 67-18). Ms. Nichols stated:

On this day Feb. 20, 2014 I meet Kim O'Neal at Wells Fargo Bank in Florence, AL. Kim O'Neal told me that she was going to give me a Cashier's Check [which] was like VOA giving me cash. She told me that I could cash the check their [sic] because the check was from that bank and I could cash it their [sic].  Kim O'Neal also told me that nobody could trace it because it was like a gift from VOA. She lied to me when she told me that it was [a] confidential [] settlement. Kim did not tell me the release I signed was going to be filed in the Court. Kim O'Neal left the Bank in Florence around 12:30 pm. The release was filed at 3:03 pm in the Court. I would not have signed the Release agreement if Kim O'Neal would have explained it to me that the money would be traceable. This could get me in trouble with Food Stamps, Section 8, and posibly [sic] SSD. Kim O'Neal didn't explain to me that it was going to be filed in the Courts. Kim O'Neal didn't explain to me that Mike Weathers attorney fee liens would be a lot more than any cost I might have to pay if I lost my case.

. . .

I showed Kim O'Neal my employment agreement with Mike Weathers when she was at my house on Feb. 19, 2014 and she told me that I would not have to pay Mike nothing, for lack of poor performance.

(Doc. 67-18, pp. 1–2).  Speaking of payments, Ms. O'Neal received a title change on February 25, 2014, effective February 1, 2014, accompanied by a salary increase, and Ms. Ferguson and Mr. Bartlett received raises in February of 2014.  Ms. Ferguson's raise was between $8,000 and $10,000.  Dr. Davis initiated the raises. (Doc. 67-45, pp. 12–14, tpp. 46–53).  Mr. Bartlett testified that all of his direct reports received raises that month.  (Doc. 67-45, pp. 12–13, tpp. 48–49).

On Monday, March 3, 2014, Ms. Nichols filed a motion for protective order and a declaration in support of the motion.  In the declaration, she asked the Court to prohibit VOA from trying to contact her directly; asked that VOA only contact

13

her through her attorney, Mr. Weathers; and asked that VOA be prohibited from threatening, harassing, or intimidating her family. (Case 08-501, Doc. 154-1). VOA filed a motion to strike. (Case 08-501, Doc. 155). Later that day, Judge Kallon dismissed the *Nichols* case and found the motion to strike and motion for protective order moot. (Doc. 67-22, p. 3). Mr. Weathers filed this case on February 18, 2016. (Doc. 1).

## ANALYSIS

### Mr. Weathers's § 1981 Retaliation Claim

Pursuant to 42 U.S.C. § 1981, Mr. Weathers asserts that the VOA defendants retaliated against him for his representation of plaintiffs in race discrimination lawsuits against the company by undermining his ability to recover fees in Ms. Nichols's lawsuit. (Doc. 1, pp. 6, 15–16, ¶¶ 20, 55–61). Section 1981 provides a federal cause of action to address racial discrimination. "[A]n individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure [her] § 1981 rights" has a claim for retaliation under § 1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452 (2008).

Mr. Weathers is not a typical retaliation plaintiff because he does not have a direct relationship with VOA. Neither the parties nor the Court has located a § 1981 retaliation claim quite like Mr. Weathers's claim. But, viewing the evidence in the light most favorable to Mr. Weathers, he is an individual who has suffered retaliation

because he has tried to help a different individual, Ms. Nichols, who was suffering direct racial discrimination, secure her § 1981 rights.  And his relationship with Ms. Nichols is one of the most important relationships that Congress meant to secure when it enacted § 1981 and when it made statutory fees available for individuals who provide legal services to victims of racial discrimination.  These core principles inform our analysis of Mr. Weathers's § 1981 retaliation claim.  We begin our analysis by examining those fundamental concepts more closely, and then we consider the parties' arguments that test the boundaries of these core concepts.

## I.

Section 1981 guarantees to all citizens, regardless of race, "the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  The statute defines "make and enforce contracts" to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. §1981(b); *see also Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006).  Ms. Nichols's § 1981 race discrimination claim against VOA, which overlapped with her Title VII race discrimination claim, concerned her ability to enjoy the "benefits, privileges, terms,

and conditions" of her employment relationship with VOA.[10]  Her contract with Mr. Weathers for legal representation, as she sought to secure her right to equal treatment in the workplace, was meant to help her secure her right to sue and to avail herself of "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

Mr. Weathers's § 1981 retaliation claim bears the hallmarks of civil rights retaliation claims.  The Supreme Court's language in *Humphries* and the Supreme Court's historical analyses of a range of retaliation actions under several civil rights statutes confirms that retaliation claims are broader than substantive antidiscrimination provisions in civil rights legislation, the latter of which require a direct relationship between the plaintiff and the defendant.  In *Humphries*, the Supreme Court emphasized that retaliation claims protect those who vindicate the civil rights of others who often cannot successfully advocate for themselves.  *See Humphries*, 553 U.S. at 445 (recognizing a §1981 retaliation claim where plaintiff

---

[10] Courts repeatedly have recognized the overlap between § 1981 race discrimination claims and Title VII race discrimination claims.  *See Blum v. Gulf Oil Corp*., 597 F.2d 936, 938 (5th Cir. 1979) (citations omitted) (explaining that § 1981 is "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII"); *see also Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir.1998) (noting that § 1981 claims "have the same requirements of proof and use the same analytical framework" as Title VII claims).  Unlike Title VII claims, § 1981 claims do not have to be exhausted administratively before a victim of race discrimination may assert them.  *See Price v. M & H Valve, Co*., 177 Fed. Appx. 1, 9 (11th Cir. 2006) (holding "a plaintiff is not required to exhaust his administrative remedies before filing a § 1981 action in federal court.").  Therefore, § 1981 claims are more accessible to victims of racial discrimination than Title VII claims.

"complained to managers that a fellow assistant manager had dismissed another black employee, Venus Green, for race-based reasons").  In *Jackson v. Birmingham Bd. of Ed.,* 544 U.S. 167 (2005), the Supreme Court noted that in *Sullivan v. Little Hunting Park, Inc.*, "we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition."  544 U.S. at 176 (citing *Sullivan*, 396 U.S. 229 (1969) (interpreting 42 U.S.C. § 1982)).  In *Sullivan*, the Supreme Court held that a white plaintiff could assert a §1982 retaliation claim against the respondent corporation because the plaintiff alleged that he was "punished for trying to vindicate the rights of minorities protected by § 1982."  *Sullivan*, 396 U.S. at 237; *see Humphries*, 553 U.S. at 447 ("[O]ur precedents have long construed §§ 1981 and 1982 similarly.").  In *Sullivan*, the Supreme Court stated:  "there can be no question but that Sullivan has standing to maintain this action."  396 U.S. at 237.  The Supreme Court allowed Mr. Sullivan to assert a retaliation claim against the offending company because he engaged in conduct designed to protect his lessor's statutory right "'to inherit, purchase, lease, sell, hold, and convey real and personal property'" as a Black man, 396 U.S. at 236–37, just as Mr. Weathers engaged in conduct designed to protect his client's right to be free from racial discrimination in the workplace.

Relying on its decision in *Burlington Northern and Santa Fe Ry. Co. v. White*, the Supreme Court in *Humphries* noted that Title VII's retaliation provision has "a

17

broader reach than the statute's substantive provision," just as the scope of retaliation actions under §1981 is broader than the scope of direct discrimination claims under §1981. 553 U.S. at 456. In *White*, the Supreme Court concluded that "[t]he scope of [Title VII's] antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." 548 U.S. at 67. The Supreme Court explained that retaliation claims necessarily are broader than substantive discrimination claims because employers have so many tools for retaliation. The Supreme Court stated:

> An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. See, *e.g., Rochon,* 438 F.3d, at 1213 (Federal Bureau of Investigation retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984, 986 (C.A.10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the antiretaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

548 U.S. at 63-64. We repeat the Supreme Court's final phrase because it is important: an antiretaliation remedy's "primary purpose" is to "maintain[] [a protected plaintiff's] unfettered access to statutory remedial mechanisms." 548 U.S. at 64.

Congress' decision to make fee awards available for attorneys who represent victims of racial discrimination serves a similar purpose.  Congress adopted 42 U.S.C. § 1988 and included an attorney fee provision under Title VII precisely because Congress wanted race discrimination plaintiffs to have "unfettered access" to civil rights statutes' "remedial mechanisms."  Under § 1988 and 42 U.S.C. § 2000e-5(k), courts may, in their discretion, "allow the prevailing party" in a race discrimination action to recover "a reasonable attorney's fee," including expert fees in Title VII cases, "as part of the costs . . . ."  42 U.S.C. § 2000e-5(k); 42 U.S.C. § 1988.  In *Independent Federation of Flight Attendants v. Zipes*, the Supreme Court stated that the "central purpose" of statutory fee awards in discrimination actions "is to vindicate the national policy against wrongful discrimination by encouraging victims to make the wrongdoers pay at law-assuring that the incentive to such suits will not be reduced by the prospect of attorney's fees that consume the recovery." 491 U.S. 754, 761 (1989).[11]

---

[11] In *Zipes*, the Supreme Court examined § 706(k), the statutory fee provision relating to Title VII actions. Because the fee provisions for Title VII and 1981 actions are identical in all relevant respects, the Supreme Court's discussion of § 706(k) in *Zipes* applies with equal force to a § 1988 fee petition. *Zipes,* 491 U.S. at 758 n.2 ("The language of § 706(k) is substantially the same as § 204(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(b). . . and 42 U.S.C. § 1988 . . . We have stated in the past that fee-shifting statutes' similar language is 'a strong indication' that they are to be interpreted alike. *Northcross v. Memphis Bd. of Education,* 412 U.S. 427, 428, 93 S. Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). *See also Hanrahan v. Hampton,* 446 U.S. 754, 758, n. 4, 100 S. Ct. 1987, 1989, n. 4, 64 L.Ed.2d 670 (1980) (noting that § 1988 was patterned on § 204(b) and § 706(k)); *Hensley, supra,* 461 U.S., at 433, n. 7, 103 S. Ct., at 1939, n. 7 (noting that the standards set forth in the opinion apply to all fee-shifting statutes with 'prevailing party' language).").

As this case illustrates, by settling a case behind the back of a plaintiff's attorney who assumed the expense and risk of a race discrimination action – here, an action that had made an expensive trip to the Eleventh Circuit Court of Appeals and was on the cusp of an expensive trial — a defendant minimizes the plaintiff's ability to collect statutory fees for her attorney because a plaintiff who settles and releases her claims pursuant to broad release language crafted by a defendant and its attorneys likely will have difficulty establishing that she is a "prevailing party," a prerequisite for a statutory fee award.[12]

Indeed, in their brief, the defendants argue that Mr. Weathers cannot establish that Ms. Nichols was a prevailing party, so he cannot prove that he was disadvantaged by VOA's settlement with Ms. Nichols.  The defendants state:

> Nichols was not the "prevailing party" in her lawsuit. To be a "prevailing party," the plaintiff must obtain a judicially sanctioned change in the legal relationship of the parties such as judgment on the merits or a court-ordered consent decree. Since there was no judgment

---

[12] In *Farrar v. Hobby*, the Supreme Court explained:

> to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." Only under these circumstances can civil rights litigation effect "the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. 103, 111–12 (1992) (citations omitted).

> or a consent decree in favor of Nichols, she was not the prevailing party. Rather, since VOANA obtained a voluntary dismissal with prejudice, VOANA was the prevailing party.

(Doc. 66-1, p. 27).  The problem, of course, is that by settling with Ms. Nichols behind Mr. Weathers's back, VOA and its attorneys were able to craft release language designed to deprive Mr. Weathers of a basis for obtaining a fee award.  Dr. Davis sent Ms. Ferguson's draft release to VOA's attorneys, and VOA's attorneys added a provision that states:  "I, Cassandra Renee Nichols, agree to petition to dismiss the Lawsuit in its entirety, *with prejudice*, costs and fees taxed as paid." (Doc. 74-87, p. 2) (emphasis in Doc. 74-87).  When Mr. Weathers asked Judge Kallon for the opportunity to petition for statutory fees for his work on behalf of Ms. Nichols, (Doc. 67-12, p. 21), VOA's lawyer responded:  "Your Honor, if I may, the [settlement] agreement also says fees will be taxed as paid already.  So the agreement is clear that the parties pay their own fees."  (Doc. 67-12, p. 21).  Judge Kallon noted that he doubted that Ms. Nichols could establish that she was a "prevailing party" for purposes of a fee award because of her settlement.  (Doc. 67-12, p. 21).  For the VOA defendants, this was mission accomplished.

Moreover, to the Supreme Court's point in *Zipes*, if Mr. Weathers enforces his contract with Ms. Nichols, the $10,000 payment that she agreed to with Ms. O'Neal may be consumed by her contractual obligation to reimburse Mr. Weathers for his expenses in *Nichols* and to pay Mr. Weathers a contingency fee for his work

in her case.[13]  The message to VOA employees who might be inclined to hire an attorney to pursue a discrimination claim against the company is clear – it will cost you.  And the message to attorneys who might be inclined to represent victims of race discrimination is clear – if you take the risk of representing a victim of race discrimination, advance her the expense of litigating, and put in years of work at the trial and appellate levels, you will receive nothing for the effort because we will settle your case directly with your client at the eleventh hour without your knowledge, and we will craft a release that preempts an attempt to recover statutory fees.  Mr. Weathers litigated Ms. Nichols's case from March 2008 to March 2014; appealed this Court's grant of summary judgment, resulting in a partial remand; and was preparing for trial when VOA settled with Ms. Nichols.  At the end of the day, Mr. Weathers is contractually entitled to 50% of the $10,000 settlement VOA paid Ms. Nichols, plus his expenses.  After paying costs and overhead, Mr. Weathers, at best, may see a *de minimis* profit for his six years of work, and Ms. Nichols's, if Mr. Weathers pursues his contractual fees and expenses, will be forced to find the money to pay him.[14]

On the record in this case, reasonable jurors could conclude that VOA's

---

[13] Doc. 74-63 is a record of Mr. Weathers's expenses in the *Nichols* case.  Doc. 74-64 is a spreadsheet of Mr. Weathers's expenses.

[14] Later in this opinion, we will discuss VOA's knowledge of Ms. Nichols's financial situation when it offered Ms. Nichols a $10,000 cash payment to settle directly with VOA.

conduct was designed to block access to the statutory remedial mechanisms that Congress provided to the victims of discrimination.  Here, the purposes of a statutory fee award and a retaliation claim marry, providing strong support for Mr. Weathers's standing to assert a retaliation claim against VOA.

And jurors could conclude that VOA used racial tactics to cause Ms. Nichols to release her right to sue VOA and to forfeit her access to a statutory fee award for Mr. Weathers.  Ms. Ferguson, VOA's law student employee, did not visit Ms. Nichols to negotiate a settlement of Ms. Nichols's lawsuit.  Instead, Dr. Davis authorized Ms. Ferguson to send Ms. O'Neal, a Black VOA employee, to persuade Ms. Nichols to settle.  Ms. Nichols testified that Ms. O'Neal told her that she was coming to her "as a black woman," so Ms. Nichols must know that she was acting in her (Ms. Nichols's) "best interest" when she told her "to take the money and settle out of court."  (Doc. 67-41, pp. 50–51, tpp. 199–201).  And Ms. O'Neal, after reviewing Ms. Nichols's contract with Mr. Weathers, told Ms. Nichols that she (Ms. Nichols) would not have to pay Mr. Weathers if she settled directly with VOA. (Doc. 67-41, tp. 201).[15]

Given the statutes that Congress has enacted to protect the victims of

---

[15] VOA contends that it sent Ms. O'Neal to negotiate with Ms. Nichols because Ms. O'Neal and Ms. Nichols lived in Huntsville, Alabama and Ms. Ferguson lived in Mobile, Alabama and because Ms. Nichols and Ms. O'Neal both worked at VOANA, though VOA concedes that Ms. O'Neal and Ms. Nichols had not met before Ms. O'Neal went to Ms. Nichols's house on February 19. (Doc. 66-1, p. 9).  A jury will have to determine VOA's motivation for designating Ms. O'Neal rather than Ms. Ferguson to negotiate with Ms. Nichols.

employment discrimination and to deter discrimination in the workplace, and given the fact that those statutory protections largely are out of reach of employees absent the assistance of experienced attorneys like Mr. Weathers, the Court believes that Mr. Weathers should be able to "maintain his *own* private cause of action under § 198[1] if he [can] show that he was 'punished for trying to vindicate the rights of minorities.'" *Jackson*, 544 U.S. at 176, n.1 (quoting *Sullivan*, 396 U.S. at 237) (emphasis is *Jackson*). "[T]o permit the [VOA] to punish [Mr. Weathers] 'for trying to vindicate the rights of minorities protected by [civil rights legislation]' would give 'impetus to the perpetuation of racial [discrimination],'" the ill toward which civil rights legislation like Title VII and § 1981 is directed. *Humphries*, 553 U.S. at 447 (quoting *Sullivan*, 396 U.S. at 237).

This conclusion is not contradicted by the Supreme Court's holding in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), a case on which the defendants rely. In *Domino's Pizza*, the Supreme Court held that in direct discrimination claims, "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." *Domino's Pizza*, 546 U.S. at 480. As discussed, the Supreme Court has drawn a clear line of between substantive discrimination actions and retaliation actions. *White*, 548 U.S. at 64. Retaliation actions are broader than direct discrimination claims, so *Domino's Pizza* offers little insight into the possible scope

24

of § 1981 retaliation claims.

To be sure, the Supreme Court observed in *Domino's Pizza* that § 1981 has its boundaries, and the statute cannot provide an antidote to "racial animus in all its noxious forms." *Domino's Pizza*, 546 U.S. at 476.  But Mr. Weathers's § 1981 retaliation claim respects those boundaries and fulfills Congress' clear purpose to encourage those harmed by racial discrimination in the workplace to discharge their roles "as 'private attorney[s] general, vindicating a policy that Congress considered of the highest priority.'" *Zipes*, 491 U.S. at 759 (quoting *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 (1968)).  Recognizing Mr. Weathers' retaliation claim is not likely to "produce satellite § 1981 litigation of immense scope." *Domino's Pizza*, 546 U.S. at 479.  Rather, recognition of his retaliation claim should deter employers from attempting to settle employment discrimination claims behind the backs of attorneys who fulfill Congress' purpose in prosecuting those cases, thereby reducing satellite fee litigation.

And this case is unlike *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304 (11th Cir. 2010), another decision on which the defendants rely.  In *Jimenez*, the plaintiff, a Black physician, alleged that a hospital discriminated against him in violation of § 1981 when the hospital suspended his staff privileges and then retaliated against him for filing an EEOC charge by delaying a hearing on his suspension.  596 F.3d at 1307–08.  The Eleventh Circuit held that Dr. Jimenez could not prove that his

25

suspension impaired his right to make contracts or otherwise interfered with his property rights because he had no contractual relationship with the hospital, and he had no right under state law "in continuing to practice medicine." *Jimenez*, 596 F.3d at 1309–11. Here, Mr. Weathers had a contractual right to fees for settlement of Ms. Nichols's race discrimination claim and a statutory opportunity for fees if he could establish that Ms. Nichols was a prevailing party.

Thus, Mr. Weathers's retaliation claim embraces the core concepts that undergird retaliation claims in race discrimination cases.

We turn, then, to the VOA defendants' specific criticisms of Mr. Weathers's § 1981 claim. To establish a § 1981 retaliation claim, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–70 (2006)). The defendants argue that Mr. Weathers cannot satisfy any of the elements of his retaliation claim.

## II.

The defendants renew their argument that Mr. Weathers cannot pursue a § 1981 retaliation claim because he did not personally oppose VOA's alleged discriminatory conduct against VOA but instead merely provided service to Ms. Nichols as her attorney. Therefore, the defendants argue, Mr. Weathers did not

engage in statutorily protected conduct.  VOA relies on the "manager rule" for this argument.  In other circumstances, the Court might agree, but here, the defendants' argument butts up against §§ 1988 and 2000e-5(k).  Congress intends for lawyers advocating for victims of racial discrimination to recover statutory fees when they are successful.  Attorney compensation is part of the statutory structure designed to encourage employees harmed by workplace discrimination to act as private attorneys general.  Mr. Weathers has offered evidence to prove that VOA targeted that potential compensation to punish him for representing VOA employees who brought racial discrimination claims against the company.  That separates Mr. Weathers from other retaliation plaintiffs who the Eleventh Circuit has held cannot pursue a retaliation claim because their reports of discrimination were part of their job duties. Moreover, Mr. Weathers's relationship with Ms. Nichols is more nuanced than the defendants' argument suggests.

The "manager rule" provides that "a management employee" who, "in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected activity'" for purposes of a retaliation claim. *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 787 (11th Cir. 2012) (applying the manager rule to Title VII claims).  In *Brush*, the plaintiff did not oppose specific discriminatory conduct; she opposed only the way in which Sears investigated a complaint of sexual harassment.  *Brush*, 466 Fed. Appx. at 786.  The Eleventh

Circuit explained:

> "because Brush's complaint involved the adequacy of Sears' internal procedure for receiving sexual harassment complaints, rather than an employment practice that Title VII declares to be unlawful," her criticisms do not relate to unlawful activity. And, since unlawful activity is the *sine qua non* of "protected activity" as defined by Title VII, Brush cannot satisfy the first requirement of a *prima facie* case for retaliation.

466 Fed. Appx. at 788 (quoting *Entrekin v. City of Panama City, Fla.,*376 Fed. Appx. 987, 994 (11th Cir. 2010)) (brackets and footnote omitted).

Applying the manager rule, this Court previously has entered judgment for an employer on an HR manager's § 1981 retaliation claim where the manager testified that he simply passed along to other management employees workplace complaints that he received. *Fletcher v. Supreme Beverage Co.*, No. 2:11–cv–00056–MHH, 2014 WL 5518294, at *5, 16–17 (N.D. Ala. Oct. 31, 2014). The plaintiff in that case did not present evidence that he actively opposed unlawful conduct; he merely relayed complaints up the chain of command as part of his job duties.

The "manager rule" does not apply in this case because Mr. Weathers did, in fact, oppose unlawful conduct. True, his opposition consisted of conduct for which he hoped to be compensated, but he did not have an obligation to take Ms. Nichols's case. Ms. Nichols contacted Mr. Weathers and requested representation, and hers was one of the first cases against VOA that Mr. Weathers agreed to take. (Doc. 67-40, pp. 33–34, tpp. 132–34). Initially, Mr. Weathers helped Ms. Nichols file her

28

EEOC charge against VOA.  (Doc. 67-4, p. 1; Doc. 67-40, pp. 35–36, tpp. 140, 143).  Later, he filed a lawsuit against VOA on her behalf.  He could have passed; he could have said "no thank you," but he agreed to help Ms. Nichols oppose VOA's allegedly unlawful conduct, and he did so on a contingency basis, taking the risk that he would be unsuccessful and profit nothing for his investment in Ms. Nichols's cause.  Without his help, Ms. Nichols likely would have not have sued VOA and almost certainly would not have successfully challenged the initial summary judgment that VOA achieved, even if she had sued the company without the assistance of an attorney.[16]

It is important here to distinguish between Mr. Weathers and anyone who may have worked on Ms. Nichols's case on his behalf.  The Court does not believe that paralegals or investigators in Mr. Weathers's office or experts who he may have retained to provide opinions on behalf of Ms. Nichols could bring a retaliation claim against VOA because of the work they performed on her case.  Those individuals would be compensated, win or lose.  They would take no risk and invest no funds to allow Ms. Nichols to pursue her claims.  Mr. Weathers, on the other hand, took the

---

[16] It is clear from the record that Ms. Nichols could not afford to retain an attorney on an hourly basis to assert her discrimination claims against VOA.  There is more about that later in this opinion.  Absent a contingency fee arrangement, Ms. Nichols would have had to proceed *pro se* if she wanted to pursue her claims.  *See generally* Joanna C. Schwartz, *Civil Rights Ecosystems*, 118 MICH. L. REV. 1539, 1559 (2020) ("[C]ivil rights litigation is an exceedingly complicated area of practice . . . [and] [i]t would make sense, then, that lawyers with experience bringing civil rights cases . . . would be more likely to succeed in the cases they bring.").

risk, fronted Ms. Nichols's litigation expenses, and, consistent with Congress' purpose, lent his skill to Ms. Nichols's cause so that she could fulfill her role as a "'private attorney[] general, vindicating a policy that Congress considered of the highest priority.'"  *Zipes*, 491 U.S. at 759 (quoting *Newman v. Piggie Park Enterprises, Inc*., 390 U.S. 400, 402 (1968)).  Only Mr. Weathers, or another attorney in his position, fits the narrow class of § 1981 retaliation plaintiff that the Court recognizes in this opinion.[17]

## III.

Additionally, with respect to protected conduct, the VOA defendants argue that Ms. Nichols did not bring a § 1981 claim in her lawsuit against VOA, so Mr. Weathers did not attempt to help Ms. Nichols secure her rights under § 1981.  *See* (Doc. 66-1, p. 24) ("Weathers never brought a claim for Nichols under § 1981 but instead brought her claims under Title VII and the ADA.").  As a result, the defendants contend, Mr. Weathers cannot assert a § 1981 retaliation claim.

The defendants' argument proceeds from a faulty premise.  As this Court and, more importantly, the Eleventh Circuit Court of Appeals recognized, Mr. Weathers included in Ms. Nichols's complaint a § 1981 race discrimination claim.  *See* pp. 5–

---

[17] The defendants cite to *Mezibov v. Allen* is not persuasive.  In that case, the Sixth Circuit examined an attorney's ability to bring § 1983 retaliation claim related to his First Amendment right to free speech, a right that the Sixth Circuit Court of Appeals held was limited for attorneys exercising their professional responsibilities in a courtroom.  411 F.3d 712 (6th Cir. 2005).

6 above.  In her complaint, Ms. Nichols alleged that VOA had violated her rights under "Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991," and she asserted that she brought her action "pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(t)(l) and (3) ('Title VII') and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a."  (Doc. 67-7, pp. 1–2).  Mr. Weathers engaged in protected conduct under §1981.

*Humphries* does not demand more than this of a § 1981 retaliation plaintiff. Mr. Humphries's employer fired him after "he had complained to managers that a fellow assistant manager had dismissed another black employee, Venus Green, for race-based reasons."  533 U.S. at 445.  There are no facts in the Supreme Court's opinion that indicate whether Mr. Humphries alleged that the employer specifically violated Ms. Green's § 1981 statutory rights—or indeed any specific statutory rights at all—or whether Mr. Humphries proved a violation of Ms. Green's statutory rights. Mr. Humphries had to show only that his dismissal was in retaliation for his complaint about the race-based treatment of someone else.

Through his representation of Ms. Nichols, Mr. Weathers opposed race-based conduct that would violate § 1981. *Hartwell v. Spencer*, 792 Fed. Appx. 687, 692 (11th Cir. 2019) ("Title VII prohibits federal employers from discharging or discriminating against any individual 'based on race, color, religion, sex, or national

origin.' 42 U.S.C. § 2000e-16.  Similarly, 42 U.S.C. § 1981 protects employees against racial discrimination. *See* 42 U.S.C. § 1981(a); *see also Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). We analyze Hartwell's § 1981 and Title VII discrimination claims under the same framework. *See Standard*, 161 F.3d at 1330.").  Though Ms. Nichols's § 1981 claim did not survive summary judgment, Mr. Weathers reasonably believed that VOA discriminated against Ms. Nichols on the basis of her race.  Indeed, Judge Barkett dissented in part from the majority's decision in the Eleventh Circuit because she found that "Nichols has raised a genuine dispute of material fact on her race discrimination claim."  (Case 08-501, Doc. 66, p. 18) (Barkett, J., concurring in part and dissenting in part); *Nichols*, 470 Fed. Appx. at 764.  Judge Barkett added:

> the statements in King's declaration are unequivocal that Stephenson planned to get rid of Nichols because she was black. A reasonable jury, which credited King's statements and not Tucker's, could infer from King's statements that it was Stephenson who made the decision to demote Nichols because of her racial animus, and therefore, the non-discriminatory reasons attested to by Tucker were merely pretext.

(Case 8-501, Doc. 66, p. 19) (Barkett, J., concurring in part and dissenting in part); *Nichols*, 470 Fed. Appx. at 765.[18]

The record demonstrates that Mr. Weathers engaged in statutorily protected conduct.

---

[18] Judge Kravitch dissented from the finding that Ms. Nichols's hostile work environment claim should survive VOA's motion for summary judgment.  (Case 08-501, Doc. 66, pp. 20–22) (Kravitch, J., concurring in part and dissenting in part); *Nichols*, 470 Fed. Appx. at 765–66.

IV.

The VOA defendants argue that VOA's direct settlement with Ms. Nichols does not amount to a materially adverse action. For purposes of a § 1981 retaliation claim, an action is materially adverse if it "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (quotation marks omitted).

As discussed in this Court's opinion denying the VOA defendants' motion to dismiss, impeding the ability of an attorney working on a contingency basis to recover a contingency fee or to qualify for a statutory award of costs, including attorney fees, is a materially adverse action. It is no different from a pay cut. *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("Tangible employment actions consist of things that affect continued employment or pay— things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone."); *Herron-Williams v. Alabama State Univ.*, 287 F. Supp. 3d 1299, 1311 (M.D. Ala. 2018), *aff'd*, 805 Fed. Appx. 622 (11th Cir. 2020) (holding that pay cut of about 17% of the plaintiff's former salary "is a quintessential adverse employment action.").

Mr. Weathers's reduction in income might have dissuaded a reasonable attorney from supporting a charge on behalf of a victim of discrimination. In his deposition, Mr. Weathers testified that he cannot fund other cases if he does not

recover fees in the cases he already has filed.  (Doc. 67-40, p. 59, tpp. 234–35).  Mr. Weathers's expenses in the *Nichols* case illustrate some of the expenses that lawyers must incur to represent a plaintiff on a contingency basis – fees for service processors and court reporters, witness fees and court fees, copy charges and travel expenses. (Doc. 74-64).  There is ample evidence that a lawyer who represents a victim of discrimination on a contingency basis would be dissuaded from representing those clients if he could not recover his expenses and fees.[19]

Of course, thanks to the VOA defendants' tactics, we will never know how Ms. Nichols's case would have ended had the VOA defendants not made an end-run around Mr. Weathers's formal $70,000 settlement demand.  Perhaps the parties would have settled.  Perhaps they would have proceeded to trial, where Ms. Nichols may have won or may have lost.  But the VOA defendants created this uncertainty, so they cannot profit from it by arguing that the evidence of an adverse action is speculative.  Nor can they say that Mr. Weathers's sole remedy lies in his contract with Ms. Nichols.  The defendants interfered with that contract, diminishing its value and harming both Mr. Weathers and the client he is duty-bound to protect.  Even if

---

[19] *See also* Maureen Carroll, *Fee-Shifting Statutes and Compensation for Risk*, 95 IND. L.J. 1021, 1038 (2020) ("If fee-shifting doctrine deems plaintiffs responsible for funding their own cases up front, then fee-shifting awards will enable litigation only in those cases that plaintiffs could already afford to fund up front--or that [lawyers] are willing to work on for free.  Fee-shifting statutes do not aim so low.  "A 'reasonable' statutory fee-shifting award is not one that merely helps to defray a successful plaintiff's out-of-pocket litigation expenses, but one 'that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case.'").

he were to pursue his breach of contract claim against Ms. Nichols and receive a judgment in his favor, the judgment likely would be uncollectible because of Ms. Nichols's financial situation, which VOA became aware of no later than December 15, 2010. (Case 08-501, Doc. 60-1) (explaining that Ms. Nichols was disabled and received Social Security benefits and food stamps and supported two minor children and stating "I am unable to pay costs in this case.").

The defendants argue that VOA's direct settlement with Ms. Nichols is a legitimate settlement that has a district judge's blessing, so the settlement cannot qualify as a materially adverse action. The argument brings us to an important point that helps clarify the boundaries of the retaliation claim that the Court is recognizing. The Court is not impugning private settlements. Parties should settle early and often:

> Courts encourage settlements as a matter of public policy to promote amicable resolution of cases and to avoid the expense of litigation. *See, e.g., Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996) ("[P]ublic policy strongly favors pretrial settlement in all types of litigation because ... cases ... 'can occupy a court's docket for years on end, depleting the resources of parties and the taxpayers while rendering meaningful relief increasingly elusive.'" (quoting *U.S. Oil & Gas v. Wolfson*, 967 F.2d 489, 493 (11th Cir. 1992))).

*Smith v. Haynes & Haynes, P.C.*, 940 F.3d 635, 650 n.7 (11th Cir. 2019). The settlement at issue in this case is tainted because of the motive underlying the settlement and the way in which the settlement was achieved.

Judge Kallon's order of dismissal demonstrates why VOA's direct settlement with Ms. Nichols is a materially adverse action. Judge Kallon found that Ms.

35

Nichols wanted to settle her case.  That is undisputed; through Mr. Weathers, Ms. Nichols made a $70,000 settlement demand shortly before VOA sent Ms. O'Neal to negotiate with Ms. Nichols.  Though Ms. Nichols submitted statements after her evidentiary hearing with Judge Kallon that provided details that Ms. Nichols did not share in the hearing, Judge Kallon found that Ms. Nichols could not challenge her release with VOA without returning the $10,000 that VOA paid her.  (Doc. 67-22, p. 2 n.1).  And Ms. Nichols could not return the money because she "immediately cashed the cashier's check she received as consideration and gave the money to her mother in Tennessee to pay Nichols' bills."  (Doc. 67-2, p. 2 n.2).  Ms. Nichols explained at the evidentiary hearing that her mother already had used $9,000 to pay bills.  (Doc. 67-12, p. 32).

According to Ms. Nichols's handwritten statement, Ms. O'Neal arranged to meet Ms. Nichols at a Wells Fargo Bank to give her a cashier's check "because the check was from that bank and [she] could cash it their [sic]."  Ms. O'Neal told Ms. Nichols that she should cash the check immediately, which she did.  (Doc. 67-18, p. 1).  Ms. Nichols stated:  "Kim O'Neal told me that nobody could trace it because it was like a gift from VOA."  (Doc. 67-18, p. 1).  Ms. Nichols added:  "Kim O'Neal also told me that I would not have to pay any taxes on the money because it can't be traced."  (Doc. 67-18, p. 2).  And the release that Ms. O'Neal presented to Ms. Nichols with the $10,000 cashier's check that Ms. Nichols could cash right there at

the bank protects VOA, its employees, and its attorneys, (Doc. 67-11, p. 1), not only from the claims that Ms. Nichols had asserted against them but also from "all claims" that "may result from the above noted dispute," (Doc. 67-11, p. 1), meaning spin-off claims resulting from the *Nichols* litigation and settlement. So, Ms. Nichols would be hard-pressed to undo her private settlement with VOA.

During discovery in this case, Ms. Nichols changed her story again. In her deposition, she testified that Mr. Weathers had told her that if she wrote the statement disaffirming her testimony to Judge Kallon regarding the voluntariness of the settlement, he (Mr. Weathers) would not sue her or demand her pay attorney's fee, which induced her to disaffirm the testimony. (Doc. 67-41, p. 47, tp. 186). Ms. Nichols testified that she did not want to disavow the release she had signed but did so to ensure that Mr. Weathers would not sue her. (Doc. 67-41, p. 47, tpp. 185–86). A jury must untangle this evidence and the other evidence regarding the means that VOA used to obtain a $10,000 settlement of Ms. Nichols's claims.

Viewing the evidence in the light most favorable to Mr. Weathers, there are genuine disputes of material fact regarding the extent to which Mr. Weathers suffered an adverse action that preclude summary judgment.

## V.

VOA argues that Mr. Weathers has not established a causal relationship between his statutorily protected activity and the materially adverse action that he

alleges he suffered.  At the summary judgment stage, a plaintiff may demonstrate causation by showing that "the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  A plaintiff must show that the defendant's retaliatory conduct was the but for cause of the interference with the plaintiff's contract-based rights.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013).  Therefore, Mr. Weathers must prove that, but for the defendants' desire to retaliate against him for his representation of Ms. Nichols and other VOA employees in their race discrimination actions, the defendants would not have excluded him from settlement discussions with Ms. Nichols.

Dr. Davis testified that the defendants' decision to approach Ms. Nichols "was about settling a case, it was not about Mr. Weathers. It was not about anything but trying to solve a case that I had no insurance on."  (Doc. 67-42, p. 47, tp. 188).  Dr. Davis also testified that the defendants "had no intentions of hurting Weathers in any way, shape, form, or fashion."  (Doc. 67-42, p. 67, tp. 266).  A jury may accept Dr. Davis's testimony, but there is evidence that could lead reasonable jurors to conclude that the VOA defendants intended to settle in a way that would harm Mr. Weathers by eliminating, or at least severely limiting, his ability to collect a fee in Ms. Nichols

case after years of litigation.[20]

Ms. Ferguson testified that she suggested that VOA settle directly with Ms. Nichols because Ms. Nichols's lawsuit was a "nuisance" and a distraction.  (Doc. 67-43, p. 32, tpp. 127–28).  In another case that Mr. Weathers filed against VOA, Dr. Davis testified that VOA planned to wrap up VOANA's operations when VOA resolved the lawsuits that Mr. Weathers filed against that company:

> A.  It is our intention to dissolve the corporation [VOANA] as soon as we're finished with you.
>
> Q.  Meaning finished with me. You mean finished with the lawsuits my clients have filed against Volunteers of –
>
> A. Yes, once we get—yes.

(Doc. 74-85, p. 19, tp. 70).  And VOA's lawyers targeted Mr. Weathers's fees in the release that Ms. Nichols signed and in the 10 days between Ms. Nichols's execution of the release of claims and Judge Kallon's dismissal of Ms. Nichols's lawsuit.  Dr. Davis sent Ms. Ferguson's draft release to VOA's attorneys, and the attorneys added a provision which stated that Ms. Nichols agreed to dismiss the case "with prejudice, costs and fee taxed as paid," which Mr. Kuffner argued to Judge Kallon in the February 26, 2014 evidentiary hearing was evidence that attorney's fees were negotiated and settled.  (Doc. 67-11, p. 1-3; Doc. 67-12, p. 21).  During the hearing,

---

[20] VOA knew that Mr. Weathers assisted Ms. Nichols with her EEOC charge.  (Case 08-501, Doc. 1-2).

Mr. Weathers argued that the Court should regard Ms. Nichols as the prevailing party so that he could petition the Court for an award of statutory fees. (Doc. 67-12, pp. 20–21). Counsel for VOA replied: "Your Honor, if I may, the [settlement] agreement also says fees will be taxed as paid already. So the agreement is clear that the parties pay their own fees." (Doc. 67-12, p. 21). Judge Kallon gave Mr. Weathers until February 28, 2014 to file a fee petition. On February 27, 2014, counsel for VOA filed a "Motion for Immediate Dismissal" in which VOA urged the Court to dismiss Ms. Nichols's action before Mr. Weathers could submit a fee petition, stating that Mr. Weathers "no longer needs additional to time to brief the attorney's fees issues." VOA argued: "Any further litigation concerning this release is redundant, wasteful and frivolous." (Case 08-501, Doc. 150, p. 3). And VOA used a cashier's check to pay its $10,000 settlement, making it significantly easier for Ms. Nichols to quickly spend the settlement funds, so that little or nothing would remain for Mr. Weathers to recover in fees and expenses.

Again, jurors reasonably could infer that the VOA defendants knew that Ms. Nichols received Social Security benefits and food stamps and was financially vulnerable and that the company understood that she needed cash, and she needed to avoid paying Mr. Weathers. Jurors also reasonably could conclude that the VOA defendants knew that because of Ms. Nichols's poverty, Mr. Weathers had to have invested significant sums of his own money to maintain Ms. Nichols's lawsuit over

40

six years, in this Court and in the Eleventh Circuit Court of Appeals, causing him to pay filing fees, expenses, and overhead, with no potential for reimbursement for attorney fees until the case was resolved.  And while VOA was working behind Mr. Weathers's back to settle with Ms. Nichols, VOA's attorneys were engaging Mr. Weathers in a tremendous amount of work, sending him 300+ pages of challenges to his trial evidence and threatening to move to exclude one of his witnesses from trial.  Reasonable jurors could conclude that VOA's settlement tactics were designed to cause Mr. Weathers significant financial pain.  Jurors must resolve the factual disputes concerning causation.

## VI.

As they did in their motion to dismiss, the VOA defendants argue that claim and issue preclusion bar Mr. Weathers' claim for attorney's fees.  Nothing in the summary judgment evidence alters the Court's previous analysis of these arguments.

Claim preclusion prevents a party from relitigating a resolved case under a new theory that should have been raised in the earlier lawsuit.  *See Maldonado v. U.S. Atty. Gen.*, 664 F.3d 1369, 1377 (11th Cir. 2011).  The party asserting claim preclusion must show that "(1) the prior decision [was] rendered by a court of competent jurisdiction; (2) there [was] a final judgment on the merits; (3) both cases [] involve[d] the same parties or their privies; and (4) both cases involve[d] the same causes of action."  *In re Piper Aircraft Corp.,* 244 F.3d 1289, 1296 (11th Cir. 2001).

41

"Only if all four of those requirements are met" will a court then consider "whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies." *Dormescar v. U.S. Atty. Gen.*, 690 F.3d 1258, 1268 (11th Cir. 2012) (internal quotation omitted). Claim preclusion generally "'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,* 140 S.Ct. 1589, 1596 (2020) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2305 (2016)). "This is for good reason: Events that occur after the plaintiff files suit often give rise to new '[m]aterial operative facts' that 'in themselves, or taken in conjunction with the antecedent facts,' create a new claim to relief." *Lucky Brand Dungarees, Inc.*, 140 S.Ct. at 1596 (quoting Restatement (Second) § 24, Comment f, at 203; 18 J. Moore, D. Coquillette, G. Joseph, G. Vairo, & C. Varner, Federal Practice § 131.22[1], p. 131–55 n.1 (3d ed. 2019)).

The VOA defendants contend that claim preclusion applies because Mr. Weathers was a "party in *Nichols*" because he filed motions on his own behalf, (Doc. 67-39), was represented by independent counsel, (Doc. 67-14), and had asked Judge Kallon to retain jurisdiction over his claim for attorney's fees. (Doc. 67-12, p. 20). Additionally, the defendants argue that Mr. Weathers was in privity with Ms. Nichols by serving as her attorney. (Doc. 66, p. 36). The defendants argue that Mr. Weathers's claims arise from the same nucleus of operative facts as the underlying

case by relying on the Court's statement in its order partially denying the motion to dismiss that "Mr. Weathers's claims for fees was sufficiently related to the underlying case such that the *Nichols* court, in its discretion could have exercised supplemental jurisdiction." (Doc. 51, p. 15).

The Court is not persuaded. Mr. Nichols was not a party in *Nichols*. His requests for attorney's fees do not change that fact. And he was not in privity with Ms. Nichols with respect to his request for fees because "Mr. Weathers's interests and Ms. Nichols's interest did not align" on that issue. (Doc. 51, p. 13). Furthermore, this case does not arise from the same nucleus of operative fact as *Nichols*. As this Court previously explained,

> *Nichols* was based on VOANA's allegedly discriminatory treatment of Ms. Nichols in the terms and conditions of her employment. Although this dispute derives from the process of resolving Ms. Nichols's claims, this case does not focus on the defendants' treatment of Ms. Nichols or on her right to be free from discrimination. Rather this dispute arises from the defendants' conduct in the course of litigating *Nichols* and their alleged mistreatment of Mr. Weathers.

(Doc. 51, p. 13). Some of the strategies that the defendants employed in settling with Ms. Nichols – for example, sending a Black employee to befriend her rather than the employee with law school experience who suggested the backdoor settlement – may reflect the very discriminatory conduct that prompted Ms. Nichols to sue VOA, but the conduct at issue in Mr. Weathers's lawsuit arose years after he filled Ms. Nichols's complaint. Because Mr. Weathers was not a party to the

43

previous case and because this case does not arise out of the same nucleus of operative fact as the *Nichols* case, claim preclusion does not bar Mr. Weathers's action.

Neither does issue preclusion. For issue preclusion to apply, defendants must show that:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998). The defendants argue that in *Nichols*, Judge Kallon decided the factual issues underlying Mr. Weathers's claims, namely that Ms. Nichols was not forced or coerced to accept the settlement. (Doc. 66, p. 38). But Judge Kallon explained that he could not consider whether Ms. Nichols's consent to the settlement was coerced because she could not return the $10,000 settlement payment, and Judge Kallon did not need to know how the VOA defendants went about settling with Ms. Nichols to conclude that Ms. Nichols's case should be dismissed because she wanted to settle, again, a fact that no one disputes. The issues that Mr. Weathers present here were not resolved in Judge Kallon's case. Accordingly, issue preclusion does not apply.

## VII.

What better way to chill discrimination actions than to punish the lawyers who

bring them by depriving the lawyers of a meaningful fee?  Lawyers who cannot recover a fee for their work when they succeed cannot afford to represent victims of discrimination, and victims of discrimination seldom undertake the difficult work of advocating against workplace discrimination without the help of an attorney. Without a federal remedy for retaliatory conduct aimed at the lawyers who represent the victims of discrimination, employers will add to their retaliatory quiver direct settlements as a means of discouraging attorneys from playing their important role in the vindication of the interests of victims of race discrimination.  A federal remedy is available to Mr. Weathers, and jurors, not this Court, must decide whether he can prevail on his retaliation claim.[21]

The defendants' arguments against recognition of Mr. Weathers's retaliation claim have their appeal, and this Court does not lightly break new ground, but the Court's examination of the parties' arguments, the evidence, and binding precedent compels the Court to recognize Mr. Weathers's § 1981 claim on the record in this case.  Therefore, the Court denies the VOA defendants' motion for summary judgment on Mr. Weathers's § 1981 claim.

---

[21] A federal remedy is important because state law remedies, such as claims for intentional interference with contractual or business relations, vary from state to state.  And state law remedies are not tailored to the interests that Congress sought to protect by providing statutory fee awards as a means of securing attorney representation for the victims of racial discrimination.

## State Law Claims[22]

### I.

Mr. Weathers contends that the defendants tortuously interfered with his contract with Ms. Nichols.  (Doc. 1, pp. 22–23).  Under Alabama law, a plaintiff pursuing a claim for tortious interference must show "(1) a protectable business relationship or contract; (2) of which the defendant knew; (3) to which the defendant was a 'stranger,' *i.e.*, a third-party; (4) the defendant's intentional interference with the contract or business relationship; and (5) resulting damage to the plaintiff." *Moore Oil Co. v. D & D Oil Co. Inc.*, 747 F. Supp. 2d 1280, 1289 (N.D. Ala. 2010) (citing *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 12–13, 14–15 (Ala. 2009)).  "One who wrongfully interferes with the business relationship of another is subject to liability for '(1) the pecuniary loss of the benefits of the ... relation; (2) consequential losses for which the interference is a legal cause; ... (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference,'" and (4) punitive damages.  *White Sands Grp., L.L.C.*, 32 So. 3d at 17 (quoting *KW Plastics v. United States Can Co.,* 131 F. Supp. 2d 1265, 1268 (M.D. Ala. 2001)).

Mr. Weathers's contract with Ms. Nichols is before the Court.  (Doc. 67-1,

---

[22] The Court previously dismissed Mr. Weathers's state law claims for invasion of privacy, outrage, and unauthorized practice of law.  (Doc. 51, p. 32).

pp. 1–6). The VOA defendants knew that Mr. Weathers had agreed to represent Ms. Nichols. When Ms. O'Neal first met with Ms. Nichols, she asked to see a copy of Ms. Nichols's contract with Mr. Weathers, and Ms. O'Neal reviewed the contract "front to back." (Doc. 67-41, pp. 49-50, tpp. 196–97). Though only Ms. O'Neal read the details of the contract, VOA knew there was a relationship between Mr. Weathers and Ms. Nichols, and jurors could reasonably infer that VOA and its attorneys knew that there was a fee arrangement between Mr. Weathers and Ms. Nichols before Ms. O'Neal visited Ms. Nichols, just as there was a fee arrangement between VOA and its attorneys. Jurors reasonably could infer that VOA knew that Ms. Nichols was not paying Mr. Weathers by the hour because in 2010, she had filed with the Court a declaration in which she explained that she was disabled, that her disability benefits did not cover her monthly expenses, and that she could not afford to pay a bill of costs after this Court entered judgment for VOA on all of her claims. (08-501, Doc. 60-1).[23]

---

[23] Dr. Davis, Ms. Ferguson, and Mr. Bartlett each testified that they had no knowledge of the fee agreement or any other financial agreement between Mr. Weathers and Ms. Nichols. (Doc. 67-42, p. 58, tp. 230; Doc. 67-43, p. 61, tp. 242; Doc. 67-45, p. 20, tp. 77). Jurors may or may not believe them, given that evidence shows that they worked closely with Ms. O'Neal as she negotiated with Ms. Nichols. (Doc. 67-41, pp. 53, 56–57, tpp. 211, 224–26). Moreover, while Mr. Bartlett initially testified that he did not know about a contract between Ms. Nichols and Mr. Weathers, he later conceded that he knew that attorneys typically memorialize their agreements with their clients in contracts but testified that he "didn't think about it" during the process of the settlement. (Doc. 67-45, p. 20, tp. 78). Ms. Ferguson testified that she attended law school for approximately two years. (Doc. 67-43, p. 31, tp. 121). Jurors could reasonably infer that she has a fairly sophisticated understanding of legal practice. To be liable for tortious interference with contract, the defendants did not have to know the details of the fee arrangement between Ms. Nichols and Mr. Weathers;

Additionally, the release that Ms. Nichols signed specifically noted that Ms. Nichols agreed to dismiss the case "with prejudice, costs and fee taxed as paid," which Mr. Kuffner argued to Judge Kallon in the February 2014 evidentiary hearing as evidence that attorney's fees were negotiated and settled. (Doc. 67-11, pp. 1–3; Doc. 67-12, p. 21). Ms. Ferguson drafted the release and worked with Dr. Davis, Mr. Bartlett, Mr. Block, and Mr. Kuffner to create the final release. (Doc. 74-82, p. 2). Moreover, as discussed above, Mr. Kuffner and Mr. Block, who certainly knew that Ms. Nichols was represented by Mr. Weathers because they knew they could not engage in settlement discussions with a represented party, were in contact with Ms. Ferguson and Dr. Davis during the settlement negotiations. (Doc. 74-82, pp. 15–16). A reasonable jury could conclude that the defendants knew of the fee arrangement.

None of the defendants against whom Mr. Weathers asserts this claim were parties to his representation agreement with Ms. Nichols, and none had rights under that agreement. Thus, the defendants were strangers to that contract. Under Alabama law, a third party may intentionally interfere with a contract by encouraging one party to the agreement to breach it. *See Bond v. Trim Line, Inc.*, 465 So. 2d 365, 368 (Ala. 1985). The Court already has concluded that there is

---

they just had to understand that there was an agreement that Mr. Weathers would represent Ms. Nichols.

substantial evidence that would allow reasonable jurors to conclude that the defendants intended to interfere with Mr. Weathers's contract with Ms. Nichols.

Regarding damages, the defendants argue that "there is no evidence that the VOA Defendants induced Nichols not to pay Weathers," (Doc. 66-1, pp. 33–34), but the defendants ignore Ms. Nichols's testimony that Ms. O'Neal, after reading Ms. Nichols's contract with Mr. Weathers, told her that she would not have to pay Mr. Weathers.  The defendants argue that "[Ms.] O'Neal told [Ms.] Nichols she could contact [Mr.] Weathers," and "[Ms.] Nichols did not rely on any statement from [Ms.] O'Neal, nor would it have been reasonable for her to do so under the circumstances."  But the defendants ignore the fact that Ms. O'Neal had tried to friend Ms. Nichols on Facebook before they met, and Ms. O'Neal urged Ms. Nichols to trust her "as a Black woman" and, according to Ms. Nichols, told Ms. Nichols that Mr. Weathers was not acting in her best interests.

The defendants also argue that "Weathers never tried to secure the remaining $1,000 that Nichols still had at the time of the evidentiary hearing with Judge Kallon." (Doc. 66-1, p. 32).  But the defendants ignore the fact that under the terms of her contract with Mr. Weathers, for a $10,000 settlement payment, Ms. Nichols owed Mr. Weathers $5,000 in fees and costs in excess of $2,000, and it ignores the fact that if Mr. Weathers had been able to settle the case for, say $25,000, Mr. Weathers would have been contractually entitled to $12,500 in fees plus expenses.

It also ignores the fact that in 2010, when VOA tried to collect costs from Ms. Nichols after the Court granted VOA's motion for summary judgment, Ms. Nichols filed a declaration in support of a request to waive costs in which she explained that she was disabled and received a total of approximately $900.00 per month in Social Security benefits and had more than $900 in monthly expenses. (Case 08-501, Doc. 59-1). Ms. Nichols still was receiving disability benefits when she settled her claim with VOA, (Doc. 67-12, p. 22), making Mr. Weathers's ability to recover fees and expenses from Ms. Nichols extremely difficult. The evidence that favors Mr. Weathers and the reasonable inferences from that evidence preclude summary judgment on Mr. Weathers's tortious interference claim.

The defendants argue that they are not liable for tortious interference with Mr. Weathers's contract because their actions in settling with Ms. Nichols directly were justified. (Doc. 66, p. 30). Justification is an affirmative defense to an intentional interference claim, and the defendant has the burden of showing that its interference was done for legitimate business purposes. *See White Sands Grp., L.L.C.*, 32 So. 3d at 14. The defendants, again viewing the evidence in the light most favorable to them, not Mr. Weathers, note that there is evidence that VOA approached Ms. Nichols directly for the legitimate business purpose of settling the case and avoiding additional fees from VOA's attorneys. (Doc. 66-1, p. 30). Again, Dr. Davis testified that the defendants' decision to approach Ms. Nichols "was about settling a case, it

was not about Mr. Weathers. It was not about anything but trying to solve a case that I had no insurance on." (Doc. 67-42, p. 47, tp. 188). Jurors might believe him. But they might not.

The record indicates that VOA's lack of insurance coverage for Ms. Nichols claims had been an issue in the *Nichols* case since 2008. In September of that year, counsel for VOA notified Mr. Weathers that VOA did not have insurance coverage for the case. (Doc. 67-4, p. 3). A few days later, VOA made a $1,000 offer of judgment to resolve Ms. Nichols's claims; Ms. Nichols rejected the offer. (Doc. 67-4, p. 4). The parties mediated unsuccessfully in 2010. (Doc. 67-4, p. 10). Before the Eleventh Circuit reviewed Ms. Nichols's appeal from the summary judgment in favor of VOA on her claims, the Eleventh Circuit scheduled her case for appellate mediation. VOA offered nothing at the mediation. (Doc. 67-4, p. 13). There is no evidence of other settlement discussions until February of 2014 when Ms. Nichols made her $70,000 demand. Three days after that demand, one of VOA's attorney emailed Mr. Weathers to notify him of a PowerPoint presentation that he planned to use during his opening statement at trial. (Doc. 67-4, p. 17). The following day, VOA's attorney emailed to notify Mr. Weathers of an upcoming motion to quash one of Ms. Nichols's trial subpoenas. (Doc. 67-4, p. 17). On February 14, 2014, VOA's attorneys filed a 342-page motion in limine. (Doc. 67-4, p. 18). Four days earlier, VOA's attorney had emailed Dr. Davis to confirm that VOA was trying to

settle directly with Ms. Nichols.  (Doc. 74-82, p. 14).  Between February 10, 2014, the day on which VOA's attorney communicated with Dr. Davis about VOA's efforts to settle with Ms. Nichols, and February 21, 2014, the date on which VOA's attorney notified Mr. Weathers that Ms. Nichols has settled with the company, Mr. Weathers was devoting eight hours per day to trial preparation.  (Doc. 74-82, pp. 17–19).  Jurors reasonably could infer that VOA's attorneys were devoting a substantial amount of time to trial preparation too, calling in to question VOA's argument that it needed to settle to save money.  Jurors also could take into account the fact that after Ms. O'Neal persuaded Ms. Nichols to settle for $10,000, purportedly because VOA could not afford to pay her more, Dr. Davis gave Ms. Ferguson a raise of between $8,000 and $10,000 dollars, gave Ms. O'Neal a promotion accompanied by a raise, and gave Mr. Bartlett a raise.

If VOA truly had wanted to cut its losses and limit its obligation to pay its attorneys, VOA would have tried to settle the case when the Eleventh Circuit Court of Appeals remanded the case to this Court in January of 2013.  Instead, VOA continued to litigate Ms. Nichols's case for another year, bringing multiple attorneys to hearings.  (*See*, *e.g.*, Case 08-501, Doc. 82).  According to Ms. Nichols, Ms. O'Neal told her that VOA had six attorneys "working for her and that I didn't have to call Mike Weathers because VOA lawyers would email him a copy of the release." (Doc. 67-18, p. 3).  Given the conflicting evidence as to the defendants' intentions

52

in settling with Ms. Nichols directly, there is a dispute over this material fact, and the defendants have not carried their burden of showing they are entitled to summary judgment on the justification defense.

## II.

Mr. Weathers's slander claim rests on three statements that Ms. Nichols reports Ms. O'Neal made to her:  that Mr. Weathers had done a "poor job," that Mr. Weathers had "no intention of helping," and that Mr. Weathers was "out to get" VOANA.  (Doc. 67-5; Doc. 67-12, p. 10; Doc. 67-18, p. 2; Doc. 67-41, p. 47, tp. 188).  Ms. O'Neal denies that she made these statements.  (Doc. 67-44, p. 38, tp. 152; Doc. 67-44, p. 34, tp. 133; Doc. 67-44, p. 69, tp. 273).  For purposes of summary judgment, the Court accepts Ms. Nichols's version of events.  Under Alabama law, to maintain a claim for slander or defamation, a plaintiff must show:

> the defendant was at least negligent in publishing a false and defamatory statement to another concerning the plaintiff, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).

*Nelson v. Lapeyrouse Grain Corp*., 534 So. 2d 1085, 1091 (Ala. 1988) (internal citations omitted).  "[I]t is not enough that the defendant's statements lead to the disparagement of the plaintiff; those statements must be false and defamatory." *Willow Lake Residential Ass'n v. Juliano*, 80 So. 3d 226, 247 (Ala. Civ. App. 2010). "A defamatory comment is one that 'tends so to harm the reputation of

another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Dudley v. Bass Anglers Sportsman Soc.*, 777 So. 2d 135, 140 (Ala. Civ. App. 2000) (quoting *Harris v. Sch. Annual Publ'g Co.*, 466 So. 2d 963, 964 (Ala. 1985) (internal quotations omitted)). "If the communication is not reasonably capable of a defamatory meaning, there is no issue of fact, and summary judgment is proper." *Bell v. Smith*, 281 So. 3d 1247, 1254 (Ala. 2019) (internal citations omitted).

If Ms. O'Neal made disparaging remarks about Mr. Weathers, she made them only to Ms. Nichols, and the remarks did not deter Ms. Nichols from dealing with Mr. Weathers. In her deposition, Ms. Nichols testified that she believed that Mr. Weathers had done a good job for her in her lawsuit. (Doc. 67-41, p. 91, 100, tpp. 362, 398–99). In her February 28, 2014 statement, Ms. Nichols wrote: "I have never terminated Mike Weathers employment as my attorney and don't intend to." (Doc. 67-18, p. 2). This unrefuted evidence is fatal to Mr. Weathers's slander claim. The Court will enter judgment for the defendants on that claim.

## III.

To establish his claim for civil conspiracy under Alabama law, Mr. Weathers must demonstrate "(1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means." *Ex parte Maint. Grp., Inc.*, 261 So. 3d 337, 347 (Ala. 2017). The VOA defendants argue that they are

entitled to judgment on Mr. Weathers's conspiracy claim because his underlying tort claim for intentional interference fails as a matter of law.  Because the Court has denied the VOA defendants' motion for summary judgment on Mr. Weathers's tortious interference claim, the defendants' primary argument for judgment in their favor on Mr. Weathers's conspiracy claim also fails.  It is undisputed that Dr. Davis, Ms. Ferguson, and Ms. O'Neal worked together and consulted with Mr. Bartlett, with the knowledge of VOA's attorneys, to try to persuade Ms. Nichols to settle with VOA privately.  This is concerted action by two or more persons.  Therefore, the Court denies the VOA defendants' motion for summary judgment on Mr. Weathers's civil conspiracy claim.

**CONCLUSION**

For the reasons stated above, the Court grants the defendants' motion for summary judgment as to Mr. Weathers's defamation claim and denies the balance of defendants' motion.

**DONE** and **ORDERED** this March 31, 2021.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE